# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

June 17, 2020

**BY ECF & EMAIL**

Honorable Ronnie Abrams
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

> **Re:** *United States v. Jesus Wilfredo Encarnacion,*
> **19 Cr. 118 (RA)**

Dear Judge Abrams,

Jesus Encarnacion spent most of his time sequestered in a room in his mother's apartment, playing video games or online. Now 30 years old, he has never been capable of living on his own. Prior to this arrest, he resided with his mother and received outpatient and in-home mental health treatment, at times mandated by the state of New York. Starting when he was around 6 years old, he was repeatedly psychiatrically hospitalized. These hospitalizations, and his low intellectual capabilities, prevented him from advancing in school; he never earned his high school degree. He has never been able to hold a job. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Mr. Encarnacion's mental illness has caused him distress and sadness throughout his life. He is lonely and often felt alienated from people around him. His medications alter his affect and cause discomfiting physical side effects. He experiences a great deal of pain and sadness most of the time. Throughout his life, he has sought to escape these feelings through a mixture of drug use and self-harm.

He also uses illicit drugs—an effort

to self-medicate—which has likely interfered with the effectiveness of his prescribed medication

Despite these life-long struggles, Mr. Encarnacion has never committed a crime before. This is his first conviction. He enjoys a loving relationship with his support network in New York, including his mother, other relatives, and neighbors. He is not a religious zealot or a hateful person.

Mr. Encarnacion is not a terrorist in any meaningful sense of that word. He is not committed to any cause. He did not actually threaten, terrorize, or harm anyone in connection with this offense. He is an intellectually-challenged, mentally ill young man who met the wrong person online.

Moreover, Mr. Encarnacion was actively abusing drugs during the period leading up to his arrest. Since his arrest, Mr. Encarnacion has become more stable and he is upset and remorseful about his own words and actions. He has been incarcerated for more than a year with no disciplinary infractions.

For all of the reasons described in this submission, and considering Mr. Encarnacion's history, personal characteristics, and the other 18 U.S.C. § 3553(a) factors, we urge the Court to impose a sentence of 60 months' imprisonment, followed by three years of supervised release.

## I.  Mr. Encarnacion's History of Mental Illness and Intellectual Disabilities

Jesus Encarnacion was born in New York in 1989. *See* Final Presentence Investigation Report (PSR) ¶ 75. His family is from the Dominican Republic, but many close family members now live in this area. Mr. Encarnacion was raised in the Catholic faith, but has experimented with various religions throughout his life. To the extent that he is religious today, he identifies with Paganism. PSR ¶ 81.

Jesus's parents were married, but separated when he was young. According to Jesus's aunt, his father was physically and verbally abusive towards Jesus's mother, and had his own mental health problems. *See* Letter of Maria Encarnacion, attached as *Exhibit F*. After the separation, Jesus's father played a limited role in his life and

did not provide financial support for the family.[1] PSR ¶ 77. In contrast, Jesus enjoyed a close and loving relationship with his mother. The family was never financially well off: his mother works as a school bus aide and sometimes struggled to support her two children. PSR ¶ 75. As she explains in her letter to the Court, she chose to work as a bus aide for children with special needs, because this allowed her to ride the school bus with her young son and protect him from bullying. *See* Letter from Juana Salcedo, attached as *Exhibit E.*

In addition to the information in the presentence report, Mr. Encarnacion's social, medical, and educational history is partially summarized in a neuropsychological evaluation by Dr. Elise Caccappolo, Ph.D., attached as *Exhibit A.*[2] From an early age, Mr. Encarnacion displayed both learning disabilities and mental illness.

---

[1] In his attached letter to the Court, Jesus's father Wilfredo acknowledges that, when Jesus was younger, he did not know how to deal with the child's mental health problems: "I was not sure how to properly handle a child with severe mental problems so my answer was to just ignore it and distance myself from the problem." *Exhibit G.*

[2] Dr. Caccappolo is the Director of the Neuropsychology Service and an Associate Professor of Neuropsychology at Columbia University. She is a Diplomate of the American Board of Professional Psychology, with specialty certification in Clinical Neuropsychology, among other credentials. Her CV is attached as *Exhibit B.*

Mr. Encarnacion's underlying mental health problems were exacerbated by abuse that he suffered as a child.

Throughout his life, Mr. Encarnacion has engaged in both drug use and self-harm ("cutting") to try and alleviate the symptoms of his mental illness. As Dr. Caccappolo describes, Mr. Encarnacion's drug use "has played a functional role in helping him to withdraw from relationships and reduced his anxiety … but has also contributed to his mental health decline." *Exhibit A* at 4. During his presentence interview, he recounted extensive drug use (which is also noted in his medical records). PSR ¶¶ 83, 106-111, 113. His mother relates that he has overdosed on drugs several times, and needed to be resuscitated. *Id.* ¶ 83.

In addition to Dr. Caccappolo, the defense retained a second psychiatric expert to try and provide a current diagnosis for Mr. Encarnacion: Dr. Jeremy H. Colley,

---

3 We have collected hundreds of pages of Mr. Encarnacion's records. The records are voluminous because he has received ongoing treatment since childhood and because he has been treated at numerous facilities throughout New York. For the sake of economy, this letter contains only summaries and excerpts of these records.

M.D. Dr. Colley's report is attached as *Exhibit C*.[4]

 

 

        To help Mr. Encarnacion receive the mental health treatment that he needs, his mother has sought the assistance of the city's legal system and social service programs. In 2016, she obtained a one-year court order for Mr. Encarnacion to receive assisted outpatient mental health treatment. PSR ¶ 96; December 2016 Order and Judgment, attached as *Exhibit T*. As a result of this order, he was given an ACT team and case management through an organization called Services for the Underserved or "S:US" (more information about this service is available at https://sus.org/our-services/behavioral-health). S:US provided a team to help Mr. Encarnacion keep up with his mental health treatment: team members would check in with him, travel to his home, accompany him to appointments, and try to verify that he was taking his medication. Mr. Encarnacion continued to require and receive ACT team assistance through 2018. PSR ¶ 99.

        Even with help, Mr. Encarnacion still struggled. In addition to being mentally ill, he has poor functional and social skills, and is borderline intellectually disabled.[5]

---

[4] Dr. Colley is a board-certified psychiatrist who works at Bellevue Hospital Center, and a forensic psychiatrist and associate clinical professor at the NYU School of Medicine. A copy of his CV is attached as *Exhibit D*. In connection with his evaluation, Dr. Colley asked to review only more recent medical records. As a result, although we have records related to Mr. Encarnacion dating back to his childhood, Dr. Colley reviewed roughly six years of records. In addition, for purposes of brevity, counsel asked him to omit from his report an extended summary of the records he reviewed, since major points are summarized in the PSR and Dr. Caccappolo's report.

He has never been able to live independently. His mother recounts that he does not know how to do his own laundry or prepare his own meals. *Exhibit A* at 2. His aunt Maria recalls a time when, at the age of 19, he tried to visit her home—a 15-minute subway ride—and called her because he did not know how to take the train by himself and was scared. *Exhibit F* at 2.

Despite all of his issues, Mr. Encarnacion has a good relationship with his mother, other family members, and neighbors. Many of these individuals have written to the Court on his behalf. These family members and friends uniformly describe Mr. Encarnacion as a kind young man who tries to help others. For example, Jesus's brother describes him as a "compassionate" person who enjoyed caring for pets and "found ways to learn what those around him wanted and made every effort to make everybody happy." Letter of Cesar Carpio, attached as *Exhibit H*.

Jesus's aunt Elisa Salcedo relates that she lived with Jesus and his mother for around five years when she first immigrated to this country. *See* Letter of Elisa Salcedo, attached as *Exhibit I*. She recalls that Jesus helped her learn English and that he was a "caring and kind young man." *Id.*

Another aunt, Reina Salcedo, describes Jesus as friendly and generous towards his family and neighbors. *Exhibit J*. His uncle Homar recalls that whenever Jesus would come to his house to visit, he would volunteer to help with household chores or to watch the children, so that his aunt and uncle could rest. *Exhibit K*.

Jesus's aunt Veronica characterizes him as someone with a "great heart" who was close with his extended family and loving with his younger cousins. *Exhibit L*. One cousin, Jose, describes Mr. Encarnacion as "very respectful and helpful." Letter of Jose Hernandez, attached as *Exhibit M*. Another cousin, Jalima, describes him as having a "naturally sweet personality." *Exhibit N*.

Additional letters from Jesus's friends and family echo these sentiments. *See* Letter of Lillian Encarnacion, attached as *Exhibit O*; Letter of Maria Rodriguez, attached as *Exhibit P*; Letter of Priscilla Martinez, attached as *Exhibit Q*; Letter of Pilar Helmann, attached as *Exhibit R*.

As these letters reflect, despite his personal limitations, Mr. Encarnacion can be an engaged and caring family member and friend. Nor is he disruptive, hateful, or actually violent towards others.

The last few years have been particularly challenging for Mr. Encarnacion, which may have contributed to his increasing instability. As Jesus's mother and aunt Reina relate, the family suffered two traumatic events. First, Mr. Encarnacion's grandmother (Juana's mother) passed away after a difficult battle with pancreatic cancer. Jesus was close to his grandmother and this was a difficult loss for him. As Reina writes, "Jesus was very affected by this event because he was always by his grandma's side …." *Exhibit J.* A family friend similarly recalls how close Jesus was to his grandmother and how he spent time assisting her when she became acutely ill and bedridden. Letter of Ana Guzman, attached as *Exhibit S.* The loss of his beloved grandmother left Mr. Encarnacion even more unmoored than he had been before.

Next, shortly after his grandmother's death, Jesus and Juana's apartment caught fire. They lost all of their belongings and were forced to relocate for months while the apartment was repaired. These events were destabilizing and, after the fire, Mr. Encarnacion was hospitalized for a time and appeared to have difficulty recovering. *See* 2017 Lenox Hill Hospital record excerpt, attached as *Exhibit W.* Even after he left inpatient treatment, Juana thinks Jesus was still continuing to feel the effects of these losses and continuing to struggle.

## II. Mr. Encarnacion's Offense and Post-Arrest Conduct

It is difficult to figure out exactly why this happened because Mr. Encarnacion simply does not have the capacity to explain it. As repeatedly documented in his medical records, he has severe intellectual limitations, limited insight into his own emotions, and a difficult time remembering things and accurately recounting matters. But in the months leading up to his arrest, he was abusing drugs and not always taking his prescription medication. His mother noticed him acting strangely, but was not sure what was going on. *Exhibit A* at 2. During this time, Mr. Encarnacion decided to identify as Muslim. He had previously, periodically experimented with or tried to learn about different religions, and people around Mr. Encarnacion thought this was just another similar phase.[6] However, around this time, he began voicing interest in terrorist activities online.

Around November 2018, Mr. Encarnacion began sending messages to an online chat group labeled as for "American Jihadis," expressing his desire to join the Islamic

---

[6] A 2017 medical record notes that Mr. Encarnacion previously reported that he had converted to Islam. But, if true, it is unclear what this means, since Mr. Encarnacion was not a practicing Muslim in 2017.

State.[7] PSR ¶¶ 23-24. In this group, Mr. Encarnacion met an individual who told him that he should join "Lashker e taiba" [Lashkar e-Tayyiba (LeT)] instead. *Id.* ¶¶ 27, 33. Mr. Encarnacion had never heard of this group before, and had no knowledge of their activities or political goals. He nonetheless agreed he should join this group. Mr. Encarnacion stated that he was "a lone wolf looking for a family I can strike the crusaders … I want to be part of a family willing to kill not afraid of death." *Id.* ¶ 24. He also at other points said that he wanted to be a "strong soldier," a "soldier of Allah," a "good Muslim," that he was ready "to kill and die in the name of Allah, and that he wanted "to learn. Fight. Kill. Die. And go to paradise," but needed help.

The individual whom Mr. Encarnacion met online in the chat room introduced Mr. Encarnacion to another person online, who could reportedly help connect him to LeT. This third person was an undercover government agent (UC-1). PSR ¶¶ 27-29. UC-1 began corresponding online with Mr. Encarnacion. *Id.* ¶ 32.

For around three months, November 2018 to January 2019, Mr. Encarnacion spoke with UC-1 online repeatedly. Mr. Encarnacion expressed his enthusiasm and interest in joining a terrorist group. But he also evinced his naivete and inability to do something like that on his own. For example, Mr. Encarnacion noted that he did not have any money to travel and that he did not know how to join a group, what to do or where to go. (He also commented that he was still learning how to be a Muslim and that he did not know how to pray.) Mr. Encarnacion thought he might be able to get the money for an airline ticket from his girlfriend, but was not sure.

UC-1 told Mr. Encarnacion that if Jesus could buy himself a ticket to London, UC-1 would take care of everything else: UC-1 would connect Mr. Encarnacion with people from LeT; tell him a cover story to explain his travel; secure his travel documents from London to Pakistan; tell him exactly where to go; finance the next part of his travel; and provide food and housing along the way. *Id.* ¶¶ 41-42.

With the help of his girlfriend (who gave him the money and literally stood next to him while he called a travel agency to buy the ticket), Mr. Encarnacion bought

---

[7] Mr. Encarnacion sent some messages through Telegram. PSR ¶¶ 14, 27. Telegram, like Whats App and Facebook Messenger (other "encrypted" messaging applications), is a free, publicly-available program, which does not require any sophisticated knowledge to use. It reportedly has approximately 200 million monthly active users. *See* Karen Chiu, *Why Telegram isn't as secure as you think*, Abacus News (Jun. 13, 2019), *available at* https://www.abacusnews.com/digital-life/why-telegram-isnt-secure-you-think/article/3014398.

an airline ticket to London on December 19, 2018.[8] He continued to speak with UC-1 about his travel plans. PSR ¶ 48.

Throughout this period, the government was intensively investigating, and electronically and physically surveilling Mr. Encarnacion: the government searched his various online communications, obtained GPS and pen register warrants related to him, tapped his phone, physically surveilled him, and installed a pole camera outside his home.

On February 7, 2019, Mr. Encarnacion was arrested when he tried to use the ticket he had purchased and board a plan to London. *Id.* ¶¶ 50-51. He was presented in court and has been detained in federal jail since that time.

Since his arrest, Mr. Encarnacion has ceased using illegal drugs and has more regularly taken his psychiatric medications. It has been a struggle in custody to consistently receive his medication and to find the right prescriptions (since the federal jails will not prescribe certain specific medications Mr. Encarnacion previously took).

Nonetheless, he is significantly more stable than he was immediately prior to his arrest. Because of the nature of the crime, he was initially held in special housing. However, he has now spent the vast majority of his time in jail in the general population. He has been incarcerated for almost a year and a half with no disciplinary infractions. PSR ¶ 8.

Mr. Encarnacion is remorseful for his actions. As he stated to the Probation Officer during his presentence interview, he regrets what he did and is glad that no one was hurt because of his actions. PSR ¶ 55. He wants to receive treatment so that he can hopefully make better decisions in the future. *Id.*

## III.   Applicable Sentencing Law

"A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc). The Court must consider each of the factors set forth in 18 U.S.C. § 3553(a) to make an individualized sentencing determination. *See, e.g.*, *Gall v. United States*, 552 U.S. 38, 59 (2007). A sentencing

---

[8] Mr. Encarnacion's girlfriend, whom he also met online and who lives in California, has been unwilling to speak with defense counsel. It is not clear how much she knew about the purpose of this travel. She was interviewed by the FBI in connection with this case and has not been charged with any wrongdoing.

court begins by calculating the advisory Sentencing Guidelines. However, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009).

Rather than simply deferring to the Guidelines, a sentencing court must make an individualized decision based on all of the factors set forth in § 3553(a). This includes considering the history and characteristics of the offender; the nature and circumstances of the offense; sentences for similarly-situated defendants; and the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment, deterrence, protection of the public, and rehabilitation of the offender. 18 U.S.C. § 3553(a). The Court must impose a sentence that is "sufficient, but not greater than necessary." *Id.*

## IV.   **Mr. Encarnacion's Advisory Sentencing Guidelines**

Mr. Encarnacion pled guilty to one count of attempting to provide material support to a terrorist organization, in violation of 18 U.S.C. § 2339B, pursuant to a written plea agreement with the government. PSR ¶¶ 2, 5.

In the plea agreement, the parties stipulated to an advisory Sentencing Guidelines range of 240 months' imprisonment, based on an offense level of 37. Mr. Encarnacion has no prior criminal history and would ordinarily be in criminal history category I. However, based on the nature of the offense, the Guidelines automatically place him in criminal history category VI. PSR ¶ 6.

The United States Probation Office calculates the same advisory Guidelines range.[9] PSR ¶¶ 66, 67, 70, 124. Probation recommends a below-Guidelines sentence of 180 months' imprisonment.

---

[9] Mr. Encarnacion does not have any legal objections to the presentence report. His factual objections are addressed and reported in the addendum. With respect to Probation's sentencing recommendation, the defense objects to the imposition of any supervised release condition requiring Mr. Encarnacion to work (PSR pp. 32-33), because he is medically disabled.

## V.   Mr. Encarnacion's history and characteristics, and the other § 3553(a) factors, support a variance to 60 months' imprisonment.

Mr. Encarnacion is a mentally ill, intellectually-disabled young man who has faced hardship throughout his life. But with comprehensive treatment, his illness can be managed safely in the community and he is not a danger to others. This is his first criminal conviction. His offense here was serious, but it is not among the most serious of material support of terrorism cases and does not warrant a sentence at or near the statutory maximum for that offense. Moreover, there is no persuasive reason to defer to the advisory Guidelines, particularly under the specific facts of this case, and a substantially-below Guidelines sentence would be sufficient to accomplish all of the statutory aims of sentencing. Nor would a below-Guidelines sentence create any unwarranted disparities. Considering all of the § 3553(a) factors, the Court should sentence Mr. Encarnacion to 60 months' imprisonment.

### A. Mr. Encarnacion's mental illness and intellectual limitations are important mitigating factors, which support a substantially below-Guidelines sentence.

Courts have consistently recognized that a defendant's intellectual disability and mental illness are important mitigating factors to be considered at sentencing. As the Supreme Court has found in the context of capital sentencing, individuals with serious intellectual limitations "do not act with the level of moral culpability that characterizes the most serious adult crime." *Atkins v. Virginia*, 536 U.S. 304, 306 (2002); *see also Andrus v. Texas*, 590 U.S. __, 2020 WL 3146872, at *5-6 (June 15, 2020) (per curiam) (finding lawyer constitutionally ineffective for failing to present "compelling" mitigation evidence, including evidence of defendant's psychiatric history, mental illness, and prior self-harm and suicide attempt).

Put simply, a defendant's mental illness or intellectual disability supports a lower sentence because "two of the primary rationales for punishing an individual by incarceration—desert and deterrence—lose some of their relevance when applied to those with reduced mental capacity." *United States v. Chatman*, 986 F.2d 1446, 1452 (D.C. Cir. 1993); *see also, e.g.*, *United States v. Re*, 682 F. App'x 33, 37 (2d Cir. 2017) (summary order) (finding district court properly considered defendant's "mental health issues" as a mitigating circumstance); *United States v. Ull*, 370 F. App'x 225, 226 (2d Cir. 2010) (summary order) (upholding sentence "well below the recommended [Guidelines] sentence" that was imposed "based on [the defendant's] mental and emotional condition"); *United States v. Rivera*, 281 F. Supp. 3d 269, 288

(E.D.N.Y. 2017) (opining that defendant's mental illness was an important mitigating factor at sentencing).

Consideration of all of the classical penological justifications for punishment—retribution, deterrence, incapacitation, and rehabilitation—show why a reduced prison sentence is appropriate for those with intellectual limitations and serious mental illness. Mentally ill and intellectually disabled individuals are less morally blameworthy than those without these limitations. In addition, they are less able to think through the consequences of their actions and to rationally weigh benefits against likely punishment, making them less susceptible to traditional methods of deterrence. An extended prison sentence is also unlikely to foster their rehabilitation or ultimately make them less likely to commit future crimes, since it separates them from more effective community-based mental health treatment.

Mr. Encarnacion understood what he was doing when he spoke to the undercover government agent online and when he tried to travel overseas. He knew these actions were wrong. At the same time, there should be no serious dispute that his mental illness and intellectual limitations interfered with his ability to make good decisions, exercise judgment, and fully think through and appreciate the consequences of his words and actions.

As his aunt Maria relates, Jesus has suffered extreme pain and loneliness throughout his life. As a result, he does not know how to believe that "his life matters and has enormous value." *Exhibit F* at 2. He spent years

"fighting to belong in society" and "struggled to understand his place in this world. ….
He believes he has been discarded by society." *Id.* These feelings of depression,
alienation, and worthlessness, and his suicidal tendencies—which are all linked to
his mental illness—likely fostered Mr. Encarnacion's expressed interest in belonging
to an organization and dying for their cause.

Importantly, Mr. Encarnacion's history demonstrates the aberrational nature
of his actions here and the fact that he does not need an extended period of
incapacitation in a prison cell: although he has long been seriously mentally ill, he
has never done anything remotely like this before. He has no prior criminal
convictions. He has lived with his mental illness for decades, but with treatment and
the help of his family, he has been able to manage it in the community. Those closest
to him repeatedly attest to his kindness and how he has never actually acted with
violence towards others. *See, e.g., Exhibit E; Exhibit H; Exhibit I; Exhibit J.*

e has
repeatedly demonstrated his willingness to seek treatment and he is anxious to do
whatever he can to make sure that he never commits a crime like this again.

Further, the Court should recognize that it is unlikely that Mr. Encarnacion's
actions would have progressed to the point that they did without the assistance of an
undercover government agent. Over the course of three months, Mr. Encarnacion
repeatedly said disturbing and vile things online. But he does not actually adhere to
radical Islamist beliefs. He had never heard of LeT before November 2018 and after
that had only the most limited understanding of the organization and its goals.
Moreover, Mr. Encarnacion would not have had the wherewithal or knowledge to try
and take steps to travel overseas or join a terrorist organization without UC-1's
guidance and encouragement.

Mr. Encarnacion is not a future danger to others. His actions here were serious.
But they were also short-lived and aberrational. To the extent that his conduct was
related to his intellectual issues or mental health, any future risk of danger can be
addressed through community supervision and ongoing psychiatric treatment.
Whenever he is released, Mr. Encarnacion will continue to live with family, most
likely his mother. Representatives from Services for the Underserved have attended
Mr. Encarnacion's past court appearances and he can be reenrolled in this program
whenever he is out of custody. A team from S:US can bring medication to him at

home, connect him to outpatient mental health services, and help ensure his compliance with any treatment regime. In addition—unlike before—Mr. Encarnacion can be subject to monitoring and drug testing by the Probation Department to make sure that he does not relapse into illegal drug use. Keeping Mr. Encarnacion off illegal drugs is an important part of keeping him stable and mentally well, and not something that his mother or community social services were previously able to do. The Probation Department has tools (such as mandatory drug testing) that were not previously available. With appropriate ongoing supervision and treatment, there is little reason to think that Mr. Encarnacion would commit any crime in the future.

Finally on this point, the Court should consider that Mr. Encarnacion's mental illness and intellectual limitations will make his prison sentence particularly difficult, and therefore particularly punitive. Psychiatric treatment in prison is often limited to medication maintenance—it does not incorporate the additional therapeutic components that Mr. Encarnacion needs.[10]

In this way, an extended prison sentence will ultimately inhibit Mr. Encarnacion's rehabilitation. The longer that he is isolated from his family, friends, and ordinary daily life and routines—and the longer that he goes without comprehensive mental health treatment—the more difficult it will be for someone with his limitations to reintegrate into society when he is released.

---

[10] Prior to the jail lockdowns and COVID-19 pandemic, a social worker working with the Federal Defenders visited Mr. Encarnacion on a weekly basis. That has not been possible during the last several months.

## B. There is no compelling reason to defer to the advisory Guidelines, especially considering the circumstances of this case.

Next, the Court should impose a below-Guidelines sentence, in part, because there is no good reason to defer to the advisory Sentencing Guidelines here: the Guidelines are not based on empirical research or other Commission expertise; as applied in this case, they are not obviously consistent with the expressed will of Congress; and they have all of the troubling aspects of other Guidelines that the Second Circuit has advised district courts to treat with great care.

The basic problem with Mr. Encarnacion's advisory Guidelines is the unreasonableness and harshness of the enhancement in U.S.S.G. § 3A1.4. Mr. Encarnacion has pled guilty to a terrorism offense and is subject a high offense level (level 26 out of 43) based on the nature of that offense. *See* PSR ¶ 57; U.S.S.G. § 2M5.3(a). This is his first arrest and criminal conviction, so he would ordinarily be in criminal history category I—a category that accurately reflects his personal characteristics and his true likelihood of recidivism.

But under U.S.S.G. § 3A1.4, every terrorism offense is automatically enhanced with a 12-level increase, and every defendant convicted of a terrorism offense is automatically placed in criminal history category VI. The resulting Guidelines range is not reasonable, and is certainly greater than necessary in Mr. Encarnacion's case.

To start, it appears that Mr. Encarnacion's crime is not actually the sort of offense to which Congress originally intended a § 3A1.4 sentencing enhancement to apply. This Guidelines is the result of a 1994 provision in which Congress directed the Sentencing Commission to create a guideline that increased the penalty for crimes that did not have terrorism as an element, but which involved or were intended to promote terrorism:

> The United States Sentencing Commission is directed to amend its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, *unless such involvement or intent is itself an element of the crime.*

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, Title XII, § 120004, 108 Stat. 1796 (emphasis added). Nevertheless, U.S.S.G. § 3A1.4, Sentencing Guidelines Amendment 526, is applicable to all crimes intended to promote terrorism—even if they already had intent to promote or involvement with terrorism as an element. Because Mr. Encarnacion's offense has a terrorism element,

it seems logical that the corresponding offense level would already account for the seriousness of a terrorism offense, and illogical to enhance Mr. Encarnacion's offense level twice on the same basis. Yet the latter is what § 3A1.4 does.

Over the years, Congress has directed the Commission to promulgate additional terrorism-related sentencing enhancements and to increase Guidelines penalties for terrorism offenses. But the fact that § 3A1.4(a)'s operation here remains inconsistent with Congressional intent can be seen from the applicable statutory penalties. Congress set a maximum penalty of 20 years in prison for Mr. Encarnacion's offense. Yet § 3A1.4 pushes his recommended sentence—indeed, the recommended sentence of *every* defendant charged with this offense—over the absolute maximum set by Congress. It cannot be that Congress intended every person convicted of this offense to be sentenced over the very maximum that Congress itself set for the crime.

This problem might be counterbalanced if the enhancement were supported by some sort of empirical research or other Sentencing Commission expertise. But it is not. As Judge Breyer aptly explains in *United States v. Alhaggagi*, the enhancement is not a product of Commission expertise and is based largely on "unsubstantiated assumptions about recidivism." 372 F. Supp. 3d 1005, 1014-16 (N.D. Cal. 2019) (describing further why it is illogical and unjust to put a first-time offender in criminal history category VI and thereby sentence him like a "career criminal" who has repeatedly demonstrated his inability or refusal to follow the law).[11] Available research actually shows that "first-time terrorism offenders are no more likely to reoffend than individuals who commit other crimes." *Id.* at 1014-15.

---

[11] In defending the terrorism Guideline, the government often cites language from *United States v. Meskini*, 319 F.3d 88 (2d Cir. 2003). That case was decided before *United States v. Booker*, 543 U.S. 220 (2005), *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Nelson v. United States*, 555 U.S. 350 (2009)—in other words, before the Supreme Court repeatedly emphasized the importance of considering the empirical research and expertise undergirding a particular Guideline. In *Meskini*, the question was only whether the Guideline had some rational basis, such that it did not violate due process. In finding that the Guideline did not violate due process, the court makes a series of unsupported statements, without citation, about the supposed recidivism rates of terrorism defendants. These statements have literally no support in the record of that case and should not be given any weight by this Court. *See, e.g.*, *Alhaggagi*, 372 F. Supp. 3d at 1015 (noting *Meskini* cited "no authority for its assertion[s]" about terrorist recidivism).

Moreover, § 3A1.4's enhancement has the most troubling characteristics that the Second Circuit has identified in other problematic Guidelines, which Guidelines the Circuit has instructed district courts to apply with "great care" because they can "easily generate unreasonable results." *See United States v. Dorvee*, 616 F.3d 174, 184, 183-88 (2d Cir. 2010). In *Dorvee*, the Second Circuit found a within-Guidelines child-pornography sentence substantively unreasonable. *Id.* at 183. In its analysis, the Circuit explained that the applicable Guideline was problematic because it had enhancements that were not based on empirical data developed by the Sentencing Commission and which were "all but inherent to the crime of conviction." *Id.* at 186-87. The Circuit also noted that the Guideline improperly drew "virtually no distinction" between "the most dangerous offenders" and others, and recommended sentences for all offenders at or near the statutory maximum—thereby "eviscerat[ing] the fundamental statutory requirement[s]" of § 3553(a). *Id.* at 187.

"The same bases for concern that the Second Circuit articulated in *Dorvee* with respect to § 2G2.2 are equally applicable to the Terrorism Enhancement" in § 3A1.4(a). *United States v. Nayyar*, No. 09 Cr. 1037 (RWS), 2013 WL 2436564, at *8 (S.D.N.Y. June 5, 2013). Indeed, even before *Dorvee*, Judge Calabresi noted concerns about this terrorism enhancement and reiterated a district court's expansive discretion to fashion a sentence under § 3553(a) when the enhancement applies:

> When the terrorism enhancement is applied, it has dramatic consequences on the applicable Guidelines range …. Yet … the terrorism enhancement casts a very broad net. …. [T]hat breadth [is] compounded by the fact that … the provision of material support[] itself covers a wide range of conduct of varying degrees of culpability …. When a Guidelines recommendation has such dramatic consequences and yet covers a multitude of sins, unusually broad sentencing discretion in the district court is essential. Indeed, it must be so to comply with the Supreme Court's remedial holding in *United States v. Booker* …."

*United States v. Stewart*, 590 F.3d 93, 153-54 (2d Cir. 2009) (Calabresi, J., concurring).

Because of these concerns, courts have exercised their discretion to sentence defendants subject to this enhancement below the advisory Guidelines range. *See, e.g.*, *Nayyar*, 2013 WL 2436564 at *7-8. In *Nayyar*, for example, the district court sentenced the defendant below the advisory Guidelines because it recognized that following § 3A1.4 "would have the ultimate effect of punishing [the defendant] as harshly as someone who had actually committed acts of terroristic violence" and who

had "a lengthy and serious criminal record … demontrat[ing] continual recidivism and a lack of ability to reform." *Id.* at *8.

These same considerations favor a below-Guidelines sentence for Mr. Encarnacion. First, there is no reason to sentence Mr. Encarnacion at or near the statutory maximum for this offense, as the Guidelines recommend. On the spectrum of material support of terrorism offenses, Mr. Encarnacion's conduct is nowhere near the most serious and simply does not warrant the absolute maximum punishment that Congress provided for this crime. In terms of his personal characteristics, Mr. Encarnacion is a far cry from actual criminal history category VI offenders. He has not demonstrated continual recidivism and a lack of ability to reform. He is a true first-time offender with no prior criminal convictions. Nor is there any reason to think he is some sort of hardened terrorist, incapable of rehabilitation. He is not actually an ideologue, he has pled guilty for his crime and expressed remorse, and he has had no violations or other problems during his time in custody to date.

Without the enhancement in § 3A1.4(a), Mr. Encarnacion's terrorism offense would carry a final offense level of 25 and he would be in criminal history category I. This yields a sentencing range of 57 to 71 months. The defense is proposing a sentence within that range. This would be a substantial and meaningful prison sentence, particularly for someone who has never been behind bars before. It would adequately address the seriousness of Mr. Encarnacion's conduct. It would be sufficient for just punishment, considering Mr. Encarnacion's history and personal characteristics. And as described in detail below, it would not result in any unwarranted disparities.

## C. A substantially-below Guidelines sentence would not create unwarranted sentencing disparities.

Finally, as part of sentencing, a court should seek to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(6). No two cases are exactly the same and every individual defendant and case have unique circumstances that merit a sentencing court's consideration. Nonetheless, there are numerous analogous cases that demonstrate why a substantially-below Guidelines sentence would not create any unwarranted disparities and, indeed, why a within-Guidelines sentence would be both unnecessary and unreasonable.

First, there is no reasonable basis to sentence Mr. Encarnacion to more than 15 years in prison. The probation department recommends 15 years. Moreover, Mr. Encarnacion's offense of conviction is nearly identical to a similar offense that carries a maximum possible sentence of 15 years and which covers the same conduct

undertaken by Mr. Encarnacion. *See* 18 U.S.C. § 2339A. Thus, it would actually create an unwarranted disparity to sentence Mr. Encarnacion to more than 15 years.

Next, a sentence lower than 10 years would be in line with sentences imposed in materially-similar cases.[12] Even when a defendant's crime involves the support of an international terrorist organization, or the threat or attempted commission of serious harm against others based on one's political beliefs, courts have imposed sentences below 10 years when the offense did not result in actual harm to others and where there were significant mitigating factors. Here are some examples of such sentences where the defendant admitted to the material support of terrorism:

- In *United States v. Ceasar*, 388 F. Supp. 3d 194 (E.D.N.Y. 2019), the defendant posted ISIL propaganda online; worked to recruit ISIL members; connected to individuals affiliated with ISIL; obtained a visa for Afghanistan; and attempted to travel to Turkey. Considering her history of trauma and mental illness, the district court sentenced her to 48 months.
- In *United States v. Asher Abid Khan*, No. 15 Cr. 263, ECF Dkt. 188 (S.D. Tex. 2019), the defendant expressed radical Islamist views online, discussed his desire to join ISIS, agreed with a friend to travel to the Middle East, contacted someone in Turkey to arrange travel to join ISIS, and traveled overseas before returning home to Texas. The district court sentenced him to 18 months, considering the fact that he did not truly have a desire to influence a foreign government, that he was remorseful, and that he appeared to have rehabilitated himself.
- In *United States v. Islam Said Natsheh*, No. 16 Cr. 166 (RS), ECF Dkt. 20, 23 (N.D. Cal. 2016), the defendant posted comments on social media supporting ISIL and attempted to travel to Turkey (and ultimately Syria) to join ISIL. The district court sentenced him to 60 months, considering his young age, history of depression, and other mitigating factors.
- In *United States v. Mohammed Hamzah Khan*, No. 14 Cr. 564, ECF Dkt. 95, 101 (N.D. Ill. 2016), the defendant planned to join ISIL and was arrested trying to travel to Turkey. Considering his age, remorse, and the information he provided the government about his recruiters, the court sentenced him to 40 months.

---

[12] As another point of reference, according to the Center for National Security at Fordham Law School, the average sentence for defendants who pled guilty in ISIS-related federal terrorism cases is 11.2 years, with a median sentence of ten years. *See The American Exception: Terrorism Prosecutions in the United States – The ISIS Cases, March 2014 – August 2017* at 8 (2017). Surely with the lack of aggregating factors, and Mr. Encarnacion's mitigating personal circumstances, he should receive a sentence below the average and median sentences for similar offenses.

- In *United States v. Aaron T. Daniels*, No. 16 Cr. 222, ECF Dkt. 87, 93 (S.D. Ohio 2018), the defendant expressed interest in jihad, contacted an ISIS recruiter, sent money to a member of the Islamic State, and attempted to travel to Libya to join ISIS. Considering mitigating factors, including the defendant's schizophrenia, the district court sentenced him to 80 months, or less than 7 years.
- In *United States v. Michael Todd Wolfe*, No. 14 Cr. 213 (SS), ECF Dkt. 1, 48 (W.D. Tex. 2015), the defendant attempted to travel to the Middle East to support ISIL. He acquired a passport, participated in fitness training, practiced military maneuvers, and was arrested attempting to board the plane. He was sentenced to 82 months.
- In *United States v. Kaskar et al.*, No. 14 Cr. 326 (JPO), ECF Dkt. 87, the defendants pled guilty to conspiracy to commit narcoterrorism and to provide material support to a foreign terrorist organization, for seeking to sell military-grade weapons and drugs to the FARC. Two defendants were sentenced to time served, while the two other defendants were sentenced to 60 months in prison.
- In *United States v. Harouna Toure*, No. 09 Cr. 1244, ECF Dkt. 134, 139 (S.D.N.Y. 2012), the defendant pled guilty to conspiring to provide material support to the FARC and Al Qaeda for agreeing to assist in the transportation of drugs for these organizations. The district court sentenced him to 63 months.
- In *United States v. Mahdi Hashi*, No. 12 Cr. 661 (JG), ECF Dkt. 339, 353 (E.D.N.Y. 2019), the defendant traveled to join al-Shababb in Somalia. The district court sentenced him to 9 years.
- In *United States v. Van Haften*, 881 F.3d 543, 543-44 (7th Cir. 2018), the defendant attempted to travel to Turkey to join ISIS, had a criminal history, and wrote online that he despised America and wanted to enslave and kill Americans. The district court sentenced him to 10 years, based in part on his mental health issues and "delusional" beliefs.
- In *United States v. Thavaraja*, 740 F.3d 253 (2d Cir. 2014), the Second Circuit upheld as substantively reasonable a 9-year sentence for material support of terrorism, for a defendant who was the principal procurement officer for a foreign terrorist organization for several years, purchasing $20 million worth of military-grade weapons and material for suicide bombs.[13]

---

[13] The absence of actual harm or other aggravating factors distinguishes Mr. Encarnacion's case from those where the Second Circuit has questioned below-Guidelines sentences. For example, his offense is a far cry from the offenses involved in *United States v. Mumuni Saleh*, 946 F.3d 97 (2d Cir. 2019). There the defendant actually assisted someone in traveling to Syria to join ISIS; planned attacks on law enforcement; and attempted to kill a federal agent, attacking him with a knife. *Id.* at

Beyond the specific charge of material support of terrorism, there are numerous other federal offenses where defendants seek to facilitate, attempt, or threaten violence based on their political beliefs. Similarly in these cases, courts have imposed sentences below ten years when there are significant mitigating factors— particularly where no one was actually harmed and the defendants had a history of mental illness that contributed to their actions. To list just a few examples:

- In *United States v. Paul M. Rosenfeld*, No. 19 Cr. 69 (NSR), ECF Dkt. 26 (S.D.N.Y. 2019), the defendant constructed and possessed a 200-pound bomb in his home and planned to detonate it on the National Mall on Election Day, in order to bring attention to the political philosophy of "sortition." Mental illness contributed to his commission of the offense and no one was injured by his conduct. He was sentenced to 16 months.

- In *United States v. Michael Sibley*, No. 15 Cr. 339 (AT), ECF Dkt. 1, 32, 35 (N.D. Ga. 2016), the defendant placed two pipe bombs in a park. They did not function because they lacked a power source, but they were loaded with shrapnel and explosives. The defendant said his goal was to make people aware of the threat of terrorism. He was sentenced to 24 months.

- In *United States v. Lawrence Mulqueen*, No. 13 Cr. 157 (KMK), ECF Dkt. 7 (S.D.N.Y. 2013), the defendant made threats against several New York politicians and supporters of President Obama. He used Facebook to urge his social media followers to commit violence. At his home, law enforcement found two rifles, ammunition, and bayonets. He was sentenced to 15 months.

- In *United States v. John Roos*, No. 16 Cr. 203 (MC), ECF Dkt. 38, 45 (D. Or. 2017), the defendant made violent threats against President Obama and FBI agents. When the government searched his home and car, they found an assault rifle, other guns, and four pipe bombs. He was sentenced to 63 months.

- In *United States v. Collin McKenzie-Gude*, No. 08 Cr. 518 (PJM), ECF Dkt. 1, 85 (D. Md. 2012), the defendant was involved in a plot to assassinate Barack Obama and amassed weapons and materials to build pipe bombs. A search of his home revealed firearms, bomb components (including pipes, timers, and reactive chemicals), and a diagram of an explosive device. He was sentenced to 61 months.

---

103-04. Where a defendant's offense involves such extreme aggravating factors, and actual harm, a sentence closer to the advisory Guidelines or statutory maximum may be reasonable—it is not reasonable for Mr. Encarnacion.

- In *United States v. Robert J. Shubert, Jr.*, No. 13 Cr. 50 (MTT), ECF Dkt. 36 (M.D. Ga. 2013), the defendant built and possessed more than 80 pipe bombs that he reportedly intended to sell to foreign nationals. He was sentenced to 78 months.

Sentencing is necessarily highly individualized. But these cases are just a sampling that demonstrate that a sentence substantially below the Guidelines, and below 10 years, would be consistent with prison sentences imposed in cases that share important characteristics with Mr. Encarnacion's case.

## VI.   Conclusion

Jesus Encarnacion has suffered tremendously throughout his life and has grappled with his serious illness since as far back as he can remember. Through these struggles, he has repeatedly demonstrated his willingness to seek and participate in treatment, and his capacity to live in the community peacefully. His actions here were not representative of his true beliefs, desires, or character. He is remorseful for what he did and willing to make changes in his life to show the Court that he will never act like this again.

Considering the entirety of Mr. Encarnacion's personal history, the circumstances surrounding this offense, and the other § 3553(a) factors, we respectfully urge the Court to sentence him to 60 months in prison, followed by supervised release.

Respectfully submitted,
/s/
Sarah Baumgartel
Assistant Federal Defender
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8772

cc:      SDNY United States Attorney's Office (by ECF and email)