UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                            :

UNITED STATES OF AMERICA           :

                                            :

      - v. -                     :             19 Cr. 118 (RA)

                                            :

JESUS WILFREDO ENCARNACION,    :
                a/k/a "Jihadistsoldgier,"   :
                a/k/a "Jihadinhear,"     :
                a/k/a "Jihadinheart,"    :
                a/k/a "Lionofthegood,"   :

                                            :

                          Defendant.    :

                                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING SUBMISSION

 

AUDREY STRAUSS
Acting United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

David W. Denton, Jr.
Kimberly J. Ravener
Assistant United States Attorneys
- Of Counsel -

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum with respect to the sentencing of defendant Jesus Wilfredo Encarnacion, currently scheduled for July 7, 2020. Encarnacion is a 30-year-old Manhattan resident who devoted himself to radical jihad, attempting to leave the United States in order to train overseas to behead, kill, and commit other acts of violence he intended to perpetrate both at home and abroad. Law enforcement thwarted Encarnacion, a self-described "lone wolf . . . willing to kill," arresting him as he attempted to board a plane for Europe, en route to Pakistan, where he planned to join the foreign terrorist organization Lashkar e-Tayyiba ("LeT"). In conversations with an undercover law enforcement officer during the course of the investigation, Encarnacion expressed a desire to serve as an "executioner" committing acts of murder on behalf of LeT, including "beheading," "shooting," and "military fighting," and a willingness to die for LeT's terrorist cause.

In the face of this brutal, chilling conduct, Encarnacion seeks a drastic downward variance based primarily on his history of mental health issues and treatment. But his challenges do not justify the extraordinary leniency he seeks. They did not prevent him from committing a terrorism offense, nor do they mitigate the danger he poses to the community.

For the reasons set forth below, the Government respectfully submits that the applicable Guidelines sentence of 240 months would be sufficient but not greater than necessary to serve the purposes of sentencing, and would be fair and appropriate in this case.

1

## RELEVANT BACKGROUND

### I.    The Offense Conduct

On November 1, 2018, Encarnacion began sending messages through a social media service to what one participant described as "a group chat for American Jihadis," consisting of nine participants (the "Jihadi Group"). (PSR ¶ 24.) Encarnacion introduced himself to the Jihadi Group by saying, "I want to fight till death alongside the Islamic State. . . . I'm a lone wolf looking for a family I can strike the crusaders. . . . I want to be part of a family willing to kill not afraid of death. I want weapons training." (*Id.*)

Two days later, another member of the group, Michael Kyle Sewell (identified as CC-1 in the Complaint) sent a private direct message to Encarnacion, introducing himself as "a brother in islam." In response to Encarnacion's statement that he wanted "to fight for change," Sewell instructed Encarnacion, "Before you think about ji[h]ad, seek knowledge, learn islam . . . stu[d]y the hero[e]s of islam," including "An[w]ar awlaki" and "Osama bin ladin." (PSR ¶ 25.)

Encarnacion and Sewell continued to communicate through the social media service.[1] Encarnacion told CC-1 that he wanted "to be a true child/soldier of God," and initially stated, "I want to join ISIS." Sewell responded, "Have fun with that . . . There is [n]o point in fi[g]hting f[o]r them. They h[a]ve no territory. . . . All youll be[ ]used for[ ]is to take bul[l]ets." Encarnacion responded, "Who is worth it in your eyes." Sewell replied to Encarnacion, "Lashker e taiba," that is, LeT. (Compl. ¶ 12.)

---

[1] In these conversations, Encarnacion also discussed potential acts of violence with Sewell that appeared unrelated to jihad. For example, on or about November 1, 2018, Encarnacion sought advice from Sewell "in murder" because "Somebody's threatening me [sic] I want to know how to kill him and get away with it." (USAO 006810 to 006813.)

LeT, a designated foreign terrorist organization based in Pakistan, has conducted operations against targets in India, with the stated objective of ending Indian control of the province of Kashmir.  In particular, LeT was responsible for the November 2008 attacks in Mumbai against luxury hotels, a Jewish center, a train station,  and a popular café that killed  166 people – including  six U.S. citizens – and injured  more than 300.  The group has also attacked Coalition  Forces in Afghanistan. LeT uses assault rifles, machine guns, mortars, explosives, and rocket-propelled  grenades, and continues  to operate freely within Pakistan, holding  public  rallies, raising  funds, and plotting  and training  for terrorist attacks. (PSR ¶¶ 11-13; Compl.  ¶ 8.)

After Sewell informed  Encarnacion that he considered LeT to be "worth it," in contrast to ISIS, Encarnacion  asked Sewell, "Do you have connections."   In  response, Sewell asked Encarnacion if he had an account to communicate  using an encrypted application.   Encarnacion said that he did, and told Sewell that his username  was "Jihadistsoldgier."   Sewell then sent Encarnacion the username for another individual  whom Sewell believed  to be a LeT recruiter, but was actually an undercover law enforcement agent ("UC-1").   Sewell instructed  Encarnacion to "[g]o contact him."   Encarnacion asked Sewell, "Who is he," to which Sewell responded, "He is in Pakistan.  They will he[l]p y[o]u get to lashker e taiba."  Encarnacion asked Sewell, "They will train me . . . ? I want to be a strong soldier."  Sewell responded "Yes they will train you."  Sewell then contacted UC-1 and advised,  in part, "i found  a [b]r[o]ther who wan[t]s to go do jihad fisimbillah  [in the cause of Allah]. . . . So he will  be a lashker e taiba fighter." (Compl.  ¶¶ 13-14.)

Encarnacion  contacted UC-1 using the encrypted application  on November 5, 2018, writing, "I seek training  guidance and brotherhood."  At the time, Encarnacion's username was "Jihadistsoldgier,"  along with the display  name of "Jihadinhear,"  and his account displayed a

picture of a portion of a black flag containing Arabic script that is commonly associated with the terrorist organization the Islamic State of Iraq and al-Sham ("ISIS"). (PSR ¶ 30; Compl. ¶ 14.)

Encarnacion continued to communicate with Sewell, stating for example, just one day after initiating contact with UC-1: "I want to join group like isis al qaeda or Taliban. I just don't have connections. I want to learn. Fight. Kill. Die. And go to paradise. Can you help me please." (PSR ¶ 31; Compl. ¶ 15.)

On November 7, 2018, UC-1 greeted Encarnacion in Arabic, to which Encarnacion responded, "I want to join an Islamic State group." Encarnacion reported back to Sewell, "He contacted me back. The guy you recommended. He asked me who gave me his information. Tell him about me please." Encarnacion also asked Sewell, "Who will I be joining??? What organization." CC-1 replied, "Laskher e taiba. Or LeT. They aare [sic] a group in pakistan. [Th]ey have way [b]etter fund[i]ng[]. And they operate in kash[m]ir afghanistan and india." Encarnacion continued to communicate with Sewell, reiterating that "I want to be a solider of Allah." Sewell advised that UC-1 "is g[oi]ng to help you get from America to pakistan. . . And t[h]en they w[i]ll get you ther[e]." Sewell then cut off contact with Encarnacion, explaining, "Its best we cut links. . . . Its safety rea [sic]. . . . If they f[o]und out your gone be[]cause of me, they will be at my fucki[n]g a[p]artment building raiding my fucki[n]g house." (Compl. ¶¶ 17-19.)

Several hours later, Encarnacion told UC-1:

> Im going to tell you something about myself. Im a soldier of Allah
> a good Muslim but ready to kill and die in the name of Allah I
> want to go to paradise I need help I want to join Islamic State I
> want to be a soldier. . . . I dedicate my life to Islam. I hate
> America. . . . They will [n]ever kill Islam. . . . I will fight for that.

UC-1 asked Encarnacion if he intended to leave his home in New York to "travel for jihad," and Encarnacion confirmed that he was planning to do so. UC-1 asked Encarnacion to consider that

decision and to pray about it, stating that "[i]f after you still want this, we talk." The following day, on or about November 8, 2018, Encarnacion responded, "I made my decision I want to do this get back to me when you can I got to go to mosque it's going to be prayer time." (Compl. ¶ 20.)

Encarnacion then exchanged the following messages with UC-1:

| | |
|---|---|
| UC-1: | What role you want with mujahideen? |
| ENCARNACION: | Executioner |
| UC-1: | This not for weak heart akhi [*brother*] |
| ENCARNACION: | I have a strong heart I'm asking for this role for a reason |
| | * * * |
| UC-1: | Our group heart of lion. You hear of it? Lashkar tayiba. |
| ENCARNACION: | No. I did some research on your group. |
| UC-1: | You find good research? Pure intention and line with Allah subhana wa taala []. |
| ENCARNACION: | Yes. |
| UC-1: | You want join our group akhi. You get best training and heart of lion? |
| ENCARNACION: | Yes. |

(Compl. ¶ 21(b).) On or about November 9, 2018, ENCARNACION continued the conversation:

| | |
|---|---|
| ENCARNACION: | I'm home. Talk to me. |
| | * * * |
| UC-1: | You fire weapon befor[e]? |
| | * * * |
| ENCARNACION: | Only handguns. . . I want to shoot machine guns assault rifles but never have only handguns. |
| UC-1: | You strong to carry rifle? |
| ENCARNACION: | I believe I'm strong enough. |
| UC-1: | Alhamdulillah [*Praise be to Allah*]. |
| ENCARNACION: | So you guys are against India. I read up on ya. You are beefing with India over Muslim land. Or is that incorrect. |
| UC-1: | Na'am hindu kaffir in India steal Kashmir. Oppress muslims. |
| ENCARNACION: | Oh. |
| UC-1: | We strike heart of india. . . You hear mumb[a]i attack? |
| | * * * |
| ENCARNACION: | Yes. |
| UC-1: | This great victory [sic] against india |

5

| ENCARNACION: | I fucking hate Hindus. |
| UC-1: | For murder of muslims.  Hindu hate muslims. |
| ENCARNACION: | They can go to hell and I'm going to help you. |

(Compl. ¶ 21(c).)

On or about November 10, 2018, ENCARNACION exchanged the following messages

with UC-1:

| ENCARNACION: | Will I live in Pakistan.  I want to fight. |
| UC-1: | You come Pakistan and train |
| ENCARNACION: | That's why |
| UC-1: | Become soldier of Allah.  Best soldiers. |
| ENCARNACION: | Yes! |
| | * * * |
| UC-1: | Get weapon training an[d] islam teach[i]ng. |
| ENCARNACION: | I'm going to mosque to learn.  Yes! This is my will come true.  I'm so happy.  True blessing from Allah. |
| UC-1: | Then get specializ train where need more muajhiden [sic]. |
| | * * * |
| ENCARNACION: | I want to execute.  I want to behead.  Shoot. |

(Compl. ¶ 21(d).)

On or about November 21, 2018, ENCARNACION exchanged the following messages

with UC-1:

| UC-1: | We have bro many places. |
| ENCARNACION: | Im happy. |
| UC-1: | More connection than oth[e]r groups like daesh [that is, ISIS] o[r] al qaeda. |
| ENCARNACION: | I want to do beheadings.  ExecutionS. |
| UC-1: | Yes akhi.  You be train in this. |
| ENCARNACION: | Thank you. |

(Compl. ¶ 21(e).)

On or about December 22, 2018, ENCARNACION exchanged the following messages

with UC-1:

| ENCARNACION: | I want to be soldier. |
| UC-1: | You need strong heart. |

| | |
|---|---|
| ENCARNACION: | I want to be respected. I have strong heart. I want to kill infidels.  This is EVERYTHING I ever wanted. |
| UC-1: | Good ahki. |
| ENCARNACION: | I don't coward out. |
| UC-1: | Killing can be hard at first akhj [sic]. |
| ENCARNACION: | This is until death. I believe it'll be easy for me. . . I feel the death of my enemies from my heart. I will have no feelings for them. I wanted to be a soldier since I was little. And I understand killing is part of it. |

* * *

| | |
|---|---|
| ENCARNACION: | You will make me executioner? Please. I want to kill on video.  Terrify our enemies. |

* * *

| | |
|---|---|
| ENCARNACION: | I want to learn beheading. Shooting.  Military fighting. |

(Compl. ¶ 21(f).)

On or about January 4, 2019, Encarnacion told UC-1, "The day is near in which I go for my Jihad." On or about January 6, 2019, Encarnacion told UC-1, "I always wanted to be soldier. I dreamed of this now it's reality. Ever since 9/11. . . . The terrorist attack. 9/11. I want to be one to attack. A major attack kuffar [*infidels*] treat me bad." On or about January 7, 2019, Encarnacion further told UC-1, "I hate this country I can't wait to go to Pakistan. . . . Yes I'd love to attack USA." UC-1 asked Encarnacion, "Why you not do [an attack] before?" Encarnacion explained, "I don't have guidance. I want to do like a bombing and shooting here. I don't have guns though." He then reaffirmed, "I need to be executioner" because "[i]t's my purpose." (Compl. ¶¶ 21(g)-(i).)

On or about January 11, 2019, ENCARNACION exchanged the following messages with UC-1:

| | |
|---|---|
| ENCARNACION: | Im so excited that Im going to Jannah [*paradise*].  And I get to kill kuffar [*infidels*]. |
| UC-1: | InshaAllah [*God willing*]. |
| ENCARNACION: | Inshallah [*God willing*]. |
| UC-1: | Many kuffar [*infidels*]. |
| ENCARNACION: | Yes I can't wait to kill.  Im going to be killing Indians? |
| UC-1: | Hindus. |

| | |
|---|---|
| ENCARNACION: | Good. |
| UC-1: | Non muslims.  Kuffar [*infidels*]. |
| ENCARNACION: | I can't wait.  I want to learn guns bombs etc. |
| UC-1: | You will learn. |
| ENCARNACION: | I never used an AK.  I love this gun. |
| UC-1: | You learn kill. |
| ENCARNACION: | Thank you. |

(Compl. ¶ 21(j).)

Encarnacion began to express an interest in leaving the United States to perform terrorist acts, in addition to his desire to commit an attack in the United States.  On November 8, 2018, Encarnacion told UC-1 that he "ha[d] to raise money and see if I can get into Pakistan."  During the months that followed, Encarnacion and UC-1 agreed on a plan that Encarnacion believed would allow him to join LeT in Pakistan.  (Compl. ¶ 21(k).)

For example, on November 8, 2018, Encarnacion asked UC-1, "You got my back from New York to Pakistan how is this supposed to work You sure I won't be arrested at airport . . . How am I supposed to do the traveling.  From where to where."  UC-1 instructed Encarnacion that he should "buy flight out of US to other count[r]y. . . . In country you meet trsuted brohers who give[] you visa an plane tickry rest of way."    Later that day, Encarnacion told UC-1, "I'll be in paki soon."  (Compl. ¶ 21(1).)

On or about November 10, 2018, ENCARNACION and UC-1 exchanged the following messages, spelling out the proposed plan:

| | |
|---|---|
| ENCARNACION: | How are we going to get me there.  What do I do.  Where do I buy tickets from where to where.  What story do I make up.  How to fool airport officials.  Please. |
| UC-1: | I not give all detail yet.  First flight from US to country wit[h] no visa need.  We have 2 akhi in Canada.  Many more in [the European Country].  [The European Country] best. |
| ENCARNACION: | So go to [the European Country]? |
| UC-1: | You arrive [the European Country], brothers meet you give you safe place for 2 day, visa and ticket. |

ENCARNACION:      I just need the first steps or set of instructions.
UC-1:                    Then you fly to Pakistan.
ENCARNACION:      Got it!

At UC-1's request, Encarnacion sent UC-1 an image of his United States passport, stating,

"Damn this risky but I'll send right now." (Compl. ¶¶ 21(m)-(n).)

On or about December 19, 2018, Encarnacion told UC-1 that "I'm buying tickets today. I

paid for ticket waiting I'll send it to you when available."   Shortly thereafter, Encarnacion sent

UC-1 a screenshot of a flight confirmation for a ticket in his name, indicating that Encarnacion

was planning to fly from JFK Airport to the European Country on February 7, 2019 to join LeT.

As Encarnacion discussed his travel plans, he confirmed to UC-1, "I got my story down. . . I go to

[the European City] to go to Masjid [*mosque*]" and that he would tell anyone who asked that his

purpose was to "meet scholar and learn Islam.  I mention nothing about jihad.  That's only our

business.  I won't slip." (Compl. ¶¶ 21(o)-(s).)

At approximately 4:00 p.m. on February 7, 2019, Encarnacion left his residence, where he

lived with his mother, carrying a backpack and a suitcase and took a livery cab to JFK Airport.

Using the ticket he had purchased, Encarnacion checked in, passed through security, and was

arrested as he attempted to board his flight out of the country to join LeT. (Compl. ¶ 23.)

Law enforcement searched Encarnacion's residence, which he shared with his mother,

following his arrest.  A dagger, two folding knives, two batons, a taser, brass knuckles, and three

copies of "The Anarchist Cookbook" were seized from his bedroom.

## II.      The Charges, Insanity Defense, and Encarnacion's Guilty Plea

On February 8, 2019, following his arrest at JFK Airport, Encarnacion was charged by

Complaint 19 Mag. 1384 with attempting to provide material support and resources to a designated

foreign terrorist organization (LeT), and conspiracy to do the same, in violation of 18 U.S.C. §

2339B.  On February 21, 2019, a grand jury sitting in this District returned a two-count Indictment charging Encarnacion with the same offenses.  Sewell was separately arrested on Feburary 8, 2018 in the Northern District of Texas, charged with conspiring with Encarnacion to provide material support to LeT, pleaded guilty, and was sentenced on or about September 17, 2019 to 240 months, the statutory maximum.  *See United States v. Sewell*, 4:19 Cr 137 (N.D. Tex.), Dkt. 48.

On August 9, 2019, the defendant filed a notice pursuant to Federal Rule of Criminal Procedure 12.2(a) and (b) (the "Rule 12.2 Notice") stating that he "intends to assert a defense of insanity and to introduce expert evidence at trial relating to a mental disease or defect, or other mental condition bearing on his guilt," specifically claiming that he "was suffering from an active psychotic disorder at the time of the charged offenses." (Dkt. No. 19.)  In light of his Rule 12.2 Notice, the Court ordered Encarnacion to provide reciprocal discovery of his medical claims to the Government and to submit to a court-ordered forensic psychiatric exam, which was conducted on October 31, 2019 and November 1, 2019 by Dr. Stuart Kleinman.  (*See* Dkt. Nos. 28, 35, 48.)

Several months later, on January 22, 2020, Encarnacion pled guilty pursuant to a plea agreement to Count One of the Indictment, attempting to provide material support to LeT.  (*See* Dkt. No. 59, Plea Tr.)  During his allocution at the plea proceeding, Encarnacion admitted, among other things, that he "tried to travel to Pakistan to join a terrorist group and fight on their behalf," identified LeT and confirmed that he knew it was a terrorist organization at the time of his offense. (*Id*. at 19-20.)  Encarnacion affirmed that he knew his conduct was against the law, but stated, "I didn't believe it was wrong." (*Id*. at 20-21.)

## THE PRESENTENCE REPORT

Consistent with the plea agreement, the presentence report ("PSR") reflects that a total offense level of 37 applies to Encarnacion's crime, and that Encarnacion falls within criminal history category of VI. (PSR ¶¶ 57-66, 70, 124.)  The Guideline imprisonment range would therefore be 360 months to life.  (*Id.* at ¶ 124.)  However, because that range exceeds the statutorily authorized maximum sentence, the Guideline term of imprisonment is the statutory maximum of 240 months.  (*Id.* at ¶¶ 123-124.)

The Probation Department recommends a variance sentence of approximately 180 months for Encarnacion because "his involvement spanned a short period of time (approximately four months), he was not a ranking member of the terrorist organization, and he did not necessarily know the terrorist organization he attempted to join before it was suggested to him by a co-conspirator," and because "the defendant's longstanding mental health and substance abuse issues, as well as the strong familial support he receives" are mitigating factors. (*See* PSR Sentencing Recommendation at 30.)  The defendant seeks a sentence of 60 months, primarily citing his mental health history and intellectual disabilities as a basis for an even more drastic variance than that recommended by Probation.  (*See* Dkt. No. 78, Def. Ltr.)  The Government disagrees with Probation's recommendation because it appears to be based, in part, upon a narrow view of the facts and circumstances of the offense.  Most critically, the 60-month sentence sought by the defense would plainly be inadequate to meet the ends of sentencing, as set forth below.

## APPLICABLE LAW

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).  After that calculation, a sentencing judge must consider

11

the seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 50).

## ARGUMENT

Encarnacion is a dangerous, troubled man who attempted to join a vicious terrorist organization in order to kill and dismember civilians. The defense strives to paint a picture of a "young man who met the wrong person online" while "sequestered in a room in his mother's apartment," but that picture is a veneer covering over the true facts. (Def. Ltr. at 1-2.) In that room, Encarnacion kept a dagger, taser, knives, brass knuckles, batons, and multiple copies of the

12

bomb-making manual "The Anarchist Cookbook."[2]    (USAO_002670-74.)    In that room, Encarnacion sought out and joined an internet group of "American Jihadis."    In that room, Encarnacion carefully packed his possessions, hid his plans from his family, and, on his own, abandoned his family, his support network, and his country in order to join a known terrorist organization, LeT.  Encarnacion not only dreamt of supporting LeT, ISIS, and similar lethal groups; in his own plea, he affirmed his plan to "fight" for LeT.  Yet, as the defendant knows, LeT does not fight in any war or conflict; LeT is a terrorist organization that mass-murders innocent civilians in the name of its cause.

## I.    Encarnacion Presents a Danger to the Public

The need to protect the public from further crimes of this defendant, see 18 U.S.C. § 3553(a)(2)(C) strongly supports the imposition of a Guidelines sentence. Terrorism crimes come with high recidivism rates and the rehabilitation of terrorism defendants like Encarnacion is notoriously difficult.  *See United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) (holding that "Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat," and noting the link between "the difficulty of deterring and rehabilitating" terrorism defendants and the conclusion that "terrorists and their

---

[2] The defendant's objection, at his plea, to this characterization of "The Anarchist Cookbook" is meritless.  It contains instructions on building explosives, booby traps, and improvised weapons, and discusses hand to hand combat, surveillance, drugs, tear gas, sabotage, and demolition.  The book has been described as "a diagram- and recipe-filled manifesto that is believed to have been used as a source in heinous acts of violence since its publication in 1971, most notably the killings of 12 students and one teacher in 1999 at Columbine High School in Littleton, Colo[rado]" and was renounced by its author.  "William Powell, 'Anarchist Cookbook' Writer, Dies at 66," *The New York Times* (Mar. 29, 2017); *see also* "I wrote the Anarchist Cookbook in 1969. Now I see its premise as flawed," *The Guardian* (Dec. 19, 2013) (recognizing that "[t]he Cookbook has been found in the possession of alienated and disturbed young people who have launched attacks against classmates and teachers. . . . and the Cookbook may have added to their sense of isolation.").  The copies seized from the defendant's bedroom are available to the Court for inspection.

supporters should be incapacitated for a longer period of time").[3]  Encarnacion's commitment to violence, his willingness to leave his life in this country to join and serve LeT– at the invitation of a co-conspirator he merely met online, despite his claims that he could barely leave his house on his own, *see* Def. Ltr. at 1—and his aspiration to commit appalling acts of murder and dismemberment for LeT, all demonstrate that Encarnacion should be incapacitated for the full term of 240 months permitted by statute and called for by the Guidelines.

The Second Circuit has repeatedly recognized that mental illness does not necessarily warrant leniency, particularly in the terrorism context.  Recently, in *United States v. Lutchman*, 910 F.3d 33 (2d Cir. 2018), the Second Circuit upheld a district court's imposition of the maximum sentence on a terrorism defendant with mental illness, where the defendant's "mental health thus cut 'both ways,'" in that it "impaired his ability to appreciate the severity of his conduct and thereby 'created a real danger in the community,'" and the district court "concluded that the only way 'to protect the public from further crimes' was to impose the maximum sentence of imprisonment.."  *Id.* at 40.  Likewise, in *United States v. Mora-Pestana*, 496 F. App'x 98 (2d Cir. 2012), the Circuit similarly upheld a statutory maximum sentence despite the defendant's psychological disorders where the district court weighed those characteristics, but also was "entitled to conclude that other factors, including the fact that the defendant provided military-grade weapons to a known, violent terrorist organization, warranted a harsher sentence."  *Id.* at

---

[3] The defendant incorrectly argues that the precedent of this Circuit, and the advisory Guidelines, should be given little weight because another district court has deemed this finding insufficiently supported by empirical evidence.  *See* Def. Ltr. 16 n.11, citing *United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 1014 (N.D. Cal. 2019).  This decision ignores the reality that history is replete with offenders who have committed heinous acts of terrorism and violence after failures to adequately disrupt them at an earlier stage, and cites no evidence for the notion that terrorism defendants will not recidivate if given sentences as low as five years, as sought by Encarnacion.

100.   In these cases, as here, the duty to protect the public could not be overridden by the defendants' mental health issues.

While the defendant attempts to use his mental health history to convince this Court that he does not present a danger to society, that view of the facts is misleading and contradicted by the evidence collected during the course of the investigation.   As in *Lutchman*, at best, Encarnacion's mental illness "cuts both ways." Encarnacion's mental health conditions did not render him an invalid, "sequested in a room in his mother's apartment," "never . . . capable of living on his own" as the defense claims (Def. Ltr. at 1); to the contrary, during the course of the offense, he traveled on his own to California to visit his girlfriend there, maintained that romantic relationship, and convinced her to assist him in procuring a plane ticket to facilitate his offense. He carefully plotted to deceive his mother and to abandon his life in the United States in order to join LeT. He is a 30-year-old man with a demonstrated capacity to hide his conduct and manipulate those around him, in order to protect shockingly violent objectives.   For example:

- On or about November 1, 2018, before he ever met UC-1, Encarnacion discussed how to avoid being intercepted by an undercover law enforcement agent, writing to Sewell, "I fear getting caught before executing my goals." (USAO_008111.)

- On or about November 3, 2018, before he ever met UC-1, Encarnacion distributed a link to the ProtonMail email service to the Jihadi Group members, guiding them to further disguise their illicit communications and stating, "Read the website. Highly secure. It's encrypted." (USAO_00934-36.)

- From the earliest days of their communications, Encarnacion undertook steps to try to protect and ensure the success of his plan, and knowing that to do so, he would

15

have to lie and evade law enforcement, he asked UC-1, "[y]ou sure I won't be arrested at airport" and "[h]ow to fool airport officials." (Compl. ¶ 21(m).)

- Encarnacion used his girlfriend's money to purchase his ticket to join LeT, but explained that he would lie to her about his plans because "[t]he less she knows the less she can tell [sic] police." (USAO_009210.)

While the defendant self-serving claims that he "simply does not have the capacity to explain" why he committed the offense, the evidence exposes that Encarnacion in fact has no such limitation because he repeatedly and unequivocally articulated his intentions, plans, and hateful motivations in online conversations. (*See, e.g.,* Compl. ¶ 21(f) ("I want to kill infidels. This is EVERYTHING I ever wanted."), *id.* ¶ 21(i) ("I need to be executioner" because "[i]t's my purpose.").

Encarnacion committed this offense despite the presence of loving family members, such as the defendant's mother, in his life and his home, and despite the availability of numerous medical professionals and community resources to assist him with his mental health challenges. It was within his mother's home that Encarnacion stored weapons and "The Anarchist Cookbook," acquired violent jihadist materials on his computer, and sought out and joined the "American Jihadis" group on the internet. Notably, Encarnacion did each of these things on his own, without any involvement from any undercover officer.

Nonetheless, the defendant attempts to diminish his dangerousness, claiming that "it is unlikely that Mr. Encarnacion's actions would have progressed to the point that they did without the assistance of an undercover government agent." (Def. Ltr. 13.) But there is no suggestion that Encarnacion was lured or entrapped by the Government. The defendant, on his own, sought out a terrorist group that could help him "fight till death alongside the Islamic State." And he continued to pursue that goal all the way to JFK airport, where he intended to board a plane to carry out his

murderous crusade. The defendant, and the public, are fortunate that when a co-conspirator steered Encarnacion to a person he believed to be a terrorist recruiter, it was in fact an undercover agent. (*See* PSR ¶ 24 ("I want to fight till death alongside the Islamic State. . . . I'm a lone wolf looking for a family I can strike the crusaders. . . . I want to be part of a family willing to kill not afraid of death. I want weapons training.").)

At each step of the way, the defendant acted willfully and at his own volition, as evidenced by the defendant's own guilty plea and the extensive evidence gathered in the course of the investigation, including the evidence seized from his home, his communications seeking to engage in terrorist acts prior to any undercover agent introduction, and UC-1's repeated cautions for the defendant to consider his actions. UC-1 did not propose that if Encarnacion could buy himself a ticket to London, "UC-1 would take care of everything else," as the defense asserts. (Def. Ltr. 8.) The communications themselves expose this mischaracterization. (*See, e.g.,* PSR ¶¶ 41-42.) If anything, these communications show that Encarnacion was paying meticulous attention to detail, attempting to rationally plan and think through every aspect of his plot as early as three months prior to his flight.

Encarnacion's argument that, as a result of his mental issues, the Guidelines overstate the severity of his offense, ignores the fact that the Guidelines provide a specific mechanism to account for mental illness where it has truly contributed to the commission of an offense. But as Encarnacion has stipulated and the facts amply confirm, those provisions do not apply to Encarnacion's condition. Under U.S.S.G. Section 5K2.13, "[a] downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." "Significantly reduced mental capacity" is defined as a circumstance

where, "the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." Where applicable, "the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense." *Id*. Encarnacion does not invoke Section 5K2.13, and the facts surrounding his conduct show that he does not qualify under its terms. Instead, he seeks a variance that would cut his sentence to just a fraction of the term prescribed by the Guidelines, citing mental health limitations that do not rise to the level of Section 5K2.13. The defendant's own words at the time of the offense, careful planning, demeanor, and straightforward admission to this Court that he knew his mission to join a foreign terrorist organization to train to kill others was illegal, but "didn't believe it was wrong," show no diminished capacity cognizable under the Guidelines. On the contrary, Encarnacion's admission that, notwithstanding his ability to tell right from wrong, he did not think it was wrong to want to behead people on behalf of a foreign terrorist organization further confirms the need to protect the public from him. A variance of the magnitude Encarnacion seeks would virtually disregard the policy statement set forth in Section 5K2.13 and its specific limitations, without any justification.

Incapacitating Encarnacion is the only means to assure the safety of the public, and to provide a thorough opportunity for monitoring, rehabilitation, and treatment for Encarnacion. Encarnacion proposes that any danger he poses can be adequately controlled by returning him to the community, but that proposal is refuted by his own conduct. (*See* Def. Ltr. 13-14.) Encarnacion acknowledges that he was already receiving comprehensive services from the Services for the Underserved and government programs, including a period of court-ordered treatment, during the time leading up to his arrest. (*See id*. at 5.) Those services failed to prevent

18

Encarnacion from radicalizing, acquiring weapons and a bomb-making manual, and engaging in a terrorism offense – which went completely unnoticed and undiscovered by those professionals and family members trying to help him. They provide no bulwark to prevent him from doing so again in the future and only very limited community monitoring, which Encarnacion has already learned to manipulate. Indeed, the only change the defendant proposes from his previous treatment is adding the services and supervision of the Probation Department, primarily to perform drug testing. (*Id.* at 14.) But there is no evidence that illegal drug use contributed to the defendant's commission of this months-long attempted terrorism plot.

Lastly, Encarnacion's claimed lack of genuine religious fervor is not a mitigating factor in this case. (*See, e.g.,* Def. Ltr. 13 (arguing that the defendant "does not actually adhere to radical Islamist beliefs").) Instead, it shows that Encarnacion's true desire was to kill, to behead, to commit heinous acts of violence, and his attraction to LeT was based on an opportunistic outlook to secure the chance to do those despicable things. For Encarnacion, like so many others, his commitment to jihad was not about religion at all; it was about justifying violence.

## II. The Nature and Seriousness of Encarnacion's Conduct and the Need for Just Punishment Warrant a Guidelines Sentence

This Court has recognized that "there is no danger to society greater than that of terrorism, no danger greater than that posted by those that think they can impose their will on others through senseless and incomprehensible violence." *United States v. Raishani*, 17 Cr. 421 (RA), Dkt. No. 62 at 25-26. Encarnacion's conduct demonstrated precisely this threat of senseless violence in extraordinarily grotesque terms. He aspired to be an "executioner" so he could sever the heads of "infidels." This is the central philosophy that serves as the rationale for mass-murder and violence espoused by LeT, al Qaeda, ISIS, and similar notorious terrorist groups, driving some of the worst terrorist acts of our lifetimes. In contrast to some other defendants, Encarnacion had a crystal-

clear vision of how he would support LeT: he would fight, he would kill, he would place himself at the center of their deadly and destructive mission. A Guidelines sentence is therefore needed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A).

Second Circuit precedent refutes the defendant's claim that he is "not a terrorist in any meaningful sense of that word." (Def. Ltr. at 2). Numerous prosecutions have focused on thwarting Americans who, like Encarnacion, attempt to travel abroad in order to support foreign terrorist organizations through various means. Through that scope, Encarnacion's conduct is among the worst offenses, given his cold and calculating plot to become a terrorist executioner, beheading civilians for LeT. Even aiding a terrorist organization through the provision of medical services "falls squarely within the core" class of conduct that the material-support statute proscribes. *See United States v. Farhane*, 634 F.3d 127, 140-41 (2d Cir. 2011); *United States v. Farhane, et al.*, 05 Cr. 673 (LAP) (S.D.N.Y.) (Dkt. 176) (sentencing the defendant to 25 years' imprisonment). The defendant's claim that he "is not among the most serious of material support for terrorism cases," Def. Ltr. 11, shows total disregard for the severity of his intention to travel abroad in order to commit beheadings, train to be a terrorist executioner, and "kill infidels." Encarnacion enthusiastically sought out and embraced grotesque violence to an extraordinary degree, and proved that he was fully committed to following through on his murderous plans.

Encarnacion's deep interest in conducting a terrorist attack here in the United States magnifies the severity of his offense even more. Encarnacion told UC-1 that he was inspired by the September 11, 2001 terrorist attacks in his home city of New York, and that he wanted to be the one to carry out a "major attack." (Compl. ¶ 21(i).) During the course of the offense, Encarnacion stated, "I hate this country . . . . Yes I'd love to attack USA." When asked why he

had not already committed an act of violence, Encarnacion responded with blunt and chilling honesty: "I don't have guidance.  I want to do like a bombing and shooting here.  I don't have guns though."  Encarnacion's own words capture that he had the will to conduct a terrorist attack in the United States, and was working to acquire the means – such as overseas training, and weapons – to carry out his lethal intentions.  Encarnacion's plans were thwarted by swift and skilled law enforcement agents, but that does not make them any less vivid, real, and horrifying. Encarnacion plotted expressly to acquire training with the goal of killing his own fellow Americans.  The severity of such a crime cannot be overstated, and consistent with the Guidelines, certainly supports the imposition of the statutory maximum sentence here.

### III.      A Guidelines Sentence Will Avoid Creating Unwarranted Disparities

Across the country, terrorism defendants who have attempted to travel, successfully traveled, or assisted another person in traveling to join and serve foreign terrorist organizations have received substantial sentences.  The defendant is wrong that a below-Guidelines sentence here would not "create any unwarranted disparities."  (Def. Ltr. 11.)  Michael Kyle Sewell, an 18-year-old with no prior criminal history who did not personally attempt to travel or "fight," but rather, pled guilty to conspiring with Encarnacion to provide material support to LeT by encouraging Encarnacion to do so, received the statutory maximum sentence of 240 months for his conduct.  *See United States v. Sewell*, 4:19 Cr 137 (N.D. Tex.), Dkt. No. 35, 48.  A Guidelines sentence in this case is reasonable and warranted in order to avoid creating sentencing disparities across comparable terrorism cases, in particular, Sewell's case.

The sentences in numerous other cases involving defendants convicted of violating the material-support statute, 18 U.S.C. § 2339B, by attempting to travel to join a foreign terrorist organization overseas are consistent with a Guidelines sentence in this case.  *See, e.g.*, *United*

*States v. Raishani*, 17 Cr. 421 (RA) (Dkt. No. 62) (imposing statutory maximum sentence of 20 years on defendant who attempted to travel to join ISIS and assisted another to do so); *United States v. Badawi, et. al*, 15 Cr. 60 (DOC) (C.D. Cal.) (two defendants each sentenced to statutory maximum of 15 years' imprisonment[4] for conspiring to provide material support to ISIS, where one defendant was arrested at airport attempting to travel overseas to join ISIS and the other defendant had supported and assisted his travel); *United States v. Zea*, 13 Cr. 72 (SJF) (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Yemen to join al Qaeda in the Arabian Peninsula); *United States v. Pugh*, 15 Cr. 116 (NGG) (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Syria to join ISIS); *United States v. Saidakhmetov*, 15 Cr. 95 (WFK) (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Turkey to join ISIS); *United States v. Alaa Sadeh*, 15 Cr. 558 (D.N.J.) (defendant sentenced to statutory maximum of 15 years' imprisonment for assisting another individual to travel to join ISIS overseas); *United States v. El-Gammal*, 15 Cr. 588 (ER) (S.D.N.Y.) (defendant sentenced to 12 years' imprisonment for facilitating the travel of another to join ISIS).

The defendant relies heavily on a litany of what he characterizes as "materially-similar cases," Def. Ltr. at 19, to contend that a Guidelines sentence in this case would in fact *create* unwarranted sentencing disparities. As the Second Circuit has repeatedly recognized, "the mandate to take into account nationwide disparities under § 3553(a)(6), as distinct from the need to give due weight to the Guidelines under § 3553(a)(4), is modest." *United States v. Goberdhan*,

---

[4] In 2015, the statutory maximum penalty for violating Section 2339B was increased from 15 years to 20 years in prison.

499 F. App'x 63, 67 (2d Cir. 2012) (quoting *United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007)).

First, Encarnacion argues that it would be unjust to sentence him to more than 15 years' imprisonment because a different statute that arguably covers his conduct, 18 U.S.C. § 2339A, carries a maximum sentence of 15 years. The Second Circuit has squarely rejected this proposition, however, holding that "[d]isparities created by the exercise of prosecutorial discretion are not 'unwarranted,'" including the question of "on what charges" a particular individual will be prosecuted. *United States v. Mejia*, 461 F.3d 158, 162 (2d Cir. 2006). In a similar vein, the defendant cites a number of cases that he acknowledges do not involve "the specific charge of material support of terrorism," (Def. Ltr. 21-22) and so are not appropriate comparators for purposes of Section 3553(a)(6). By definition, as the Second Circuit noted in *Mejia*, disparities resulting from the prosecution of defendants on different charges are not the sort of "unwarranted" disparities that Section 3553(a)(6) instructs courts to consider. *See also, e.g.*, *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010) ("[S]entence disparities between co-defendants who were convicted of different charges . . . are not unwarranted disparities under § 3553(a)(6).").[5]

Second, as to the specific cases Encarnacion cites, he simply lumps together cases involving individuals who have been convicted under 18 U.S.C. § 2339B without regard to the statutory focus on avoiding unwarranted disparities among defendants with "similar conduct." 18

---

[5] The same analysis applies to many of the cases Encarnacion cites that do involve material support for terrorism, but which predate Congress's amendment of that statute on June 2, 2015 to raise the statutory maximum sentence for violations of 18 U.S.C. § 2339B from 15 years' imprisonment to 20 years' imprisonment, *see* Pub. L. 114–23, title VII, § 704, June 2, 2015, reflecting Congress's renewed intent that punishment for providing material support to a designated foreign terrorist organization receive even more serious punishment than had been applied up to that point.

U.S.C. § 3553(a)(6).  The cases the defendant cites are not ones involving "similar conduct," and the conduct at issue in those cases stands in sharp contrast with Encarnacion's repeated professed desire to commit acts of extraordinary violence, including "beheadings" as an "executioner" on behalf of LeT.  Indeed, only one of the cases included anything even approaching the same gruesome professions of desire to commit violent acts at issue in this case.  In *United States v. Van Haften*, 15 Cr. 37 (JDP) (W.D. Wis. 2017), the defendant made less explicit but nonetheless violent professions of his desire to commit murder—in that case on behalf of ISIS.  The defendant, who was charged under the then-applicable provisions of Section 2339B that provided for a 15-year maximum sentence, was sentenced to 10 years' imprisonment and a lifetime of supervised release, due in part to what Encarnacion characterizes as the defendant's "mental health issues," but which the district court more accurately described as "a brain injury when he's 12 that put him in a coma for weeks," Dkt. 90 at 17, and which was the subject of testimony—and cross-examination—at sentencing.  None of the other cases the defendant cites involved anything like the sort of violent ideations expressed by Encarnacion in this case, which continued over the course of months, and cannot be attributed to an isolated episode.  Cases that involve posting propaganda online, such as *United States v. Ceasar*, 388 F. Supp. 3d 194 (E.D.N.Y. 2019), or more generic desire to travel to join a terrorist organization, such as *United States v. Islam Said Natsheh*, No. 16 Cr. 166 (RS) (N.D. Cal. 2016), are simply not appropriate comparators for a defendant like Encarnacion who repeatedly and insistently expressed his desire to personally commit heinous acts of violence on behalf of a cause that he wholeheartedly adopted.

Beyond that critical distinction, the cases the defendant cites are distinguishable in other ways as well.  In *United States v. Mohammed Hamzah Khan*, No. 14 Cr. 564, (N.D. Ill. 2016), and *United States v. Michael Todd Wolfe*, No. 14 Cr. 213 (SS) (W.D. Tex. 2015), the defendants

cooperated with the Government and were sentenced after motions by the Government pursuant to Section 5K1.1 of the Guidelines.  In *United States v. Kaskar, et al.*, 14 Cr. 326 (JPO) (S.D.N.Y. 2018), and *United States v. Toure et al.*, 09 Cr. 1244 (BSJ/LAP) (S.D.N.Y. 2012), the defendants were all involved in providing collateral support to a terrorist organization motivated by profit, and did not themselves seek to engage in violence on behalf of a terrorist organization or join the organization itself.  Other cases cited by the defendant are simply *sui generis*.  In *United States v. Mahdi Hashi et al.*, 12 Cr. 661 (JG) (E.D.N.Y. 2016), all three defendants faced a statutory maximum term of 15 years imprisonment.  Two defendants (not cited by Encarnacion) were sentenced to 11 years' imprisonment, and the third (which Encarnacion does note) to nine years' imprisonment, which reflected conduct that "was wholly extra territorial, not specifically directed at Americans, and their need for just punishment in the U.S. prison system [wa]s mitigated to some extent by the treatment they received during a short period of time in foreign custody as well as their agreement to removal from the United States following the service of their respective sentences." (Dkt. 339 at 10.)  Similarly, in *United States v. Thavaraja*, 740 F.3d 253, 261 (2d Cir. 2014), the Second Circuit affirmed the district court's consideration of the fact that the defendant's conduct took place entirely outside the United States and was not targeted at the United States except insofar as it supported a terrorist organization (the Liberation Tigers of Tamil Eelam) who had been designated under U.S. law.

Encarnacion's request for a sentence of only five years' imprisonment—15 years below the applicable Guidelines sentence—is utterly divorced from the reality and seriousness of this case and from the relevant precedent outlined above. (*See* Def. Ltr. at 2.)  Encarnacion did not seek to facilitate the travel of another, or provide non-violent means of monetary or other support.  Encarnacion strove to personally travel to commit himself to LeT, abandoning the only

life he knew.  Wholly unprompted, he begged to become a murderer.  He plotted to kill and dismember victims in medieval ways, plunging knives and swords into the bodies of innocents with his own hands.  He planned to attack both here at home and abroad, and he offered the ultimate sacrifice: his willingness to die for its terrorist cause.  Encarnacion's deeply terrifying offense conduct demonstrates that he is most certainly a terrorist, in line with the cases cited above.  A Guidelines sentence for Encarnacion is fully justified to avoid unwarranted sentencing disparities, in recognition of the similar danger to the public he presents and the seriousness of his offense.

### D.    A Guidelines Sentence Is Necessary To Afford Adequate Deterrence and To Promote Respect for the Law

A Guidelines sentence is also necessary in order to adequately deter criminal conduct—in this case, terrorism aimed at harming Americans and American interests—and to promote the law prohibiting such destructive conduct.  *See* 18 U.S.C. § 3553(a)(2)(A)-(B).  The Guidelines applicable here are the product of a Congressional mandate that the Sentencing Commission establish a Guidelines enhancement for terrorism offenses to ensure that those convicted of such crimes receive punishment commensurate with the extraordinary nature of their conduct.  *See United States v. Stewart*, 590 F.3d 93, 172 (2d Cir. 2009) (citing Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 120004, 108 Stat. 1796, 2022).  As Judge Walker observed in his concurrence in *Stewart*, "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life."  *Stewart*, 590 F.3d at 181.

The capacity of a terrorist organization like LeT to thrive hinges in large part on its ability to grow its membership—to attract, indoctrinate, and enlist new followers, like Encarnacion, who are committed to advancing and serving LeT's murderous agenda or die trying.  It is only through

this support that LeT and other terrorist groups are able to fulfill their missions of hate, murder, and violence.  Deterring such conduct is particularly important in today's environment, when many young people in the West, including in the United States, have become radicalized by jihadist propaganda online, and have either traveled or tried to travel to the Middle East to join terrorist groups or conduct attacks here in New York City.  It is vital for our country's national security that other young men and women who reside in the United States, when exposed to hateful extremist teaching, be deterred from choosing to follow a path similar to Encarnacion's and engaging in potentially devastating conduct in support of such groups.  It is important for those contemplating joining a terrorist organization to know that the consequences for such conduct are serious.  And it is important for the public to know that those who seek to join and support terrorist organizations will face serious punishment preventing them from causing harm to society.  A Guidelines sentence is necessary and warranted in this case to serve the pressing need for general deterrence of such terrorism offenses.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a substantial sentence consistent with the applicable Guidelines sentence of 240 months' imprisonment is appropriate for Encarnacion and not greater than necessary to serve the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a).

Dated:          New York, New York
                June 25, 2020

                                    Respectfully submitted,

                                    AUDREY STRAUSS
                                    Acting United States Attorney


                            By: _____/s/_____
                                    David W. Denton, Jr.
                                    Kimberly J. Ravener
                                    Assistant United States Attorneys
                                    (212) 637-2744/ 2358

28